Mark Mausert
NV Bar No. 2398
729 Evans Avenue
Reno, NV 89512
(775) 786-5477
Fax  (775) 786-9658
mark@markmausertlaw.com

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF NEVADA

STEPHANIE SHARP, CYNTHIA
MARTINEZ, PATRICIA SPEIGHT,
LAURA VIRAMONTES GARCIA,
REBECCA GAROUTTE & ANTHONY
BAKER,

        Plaintiffs,

      vs.

S & S ACTIVEWEAR, L.L.C.

        Defendant.
_____/

Case No.:

**COMPLAINT AND JURY
DEMAND AND COLLECTIVE
ACTION ALLEGATION
COMPLAINT**

COME NOW plaintiffs, through counsel, and hereby complain of defendant as follows:

## Jurisdiction, Venue & Jury Demand

1. Five of the named plaintiffs are adult women and one is an adult man who, while employed by defendant in northern Nevada, resided in northern Nevada. All, or almost all, acts, statements and omissions herein alleged occurred in northern Nevada. All plaintiffs timely filed administrative complaints, and then Charges of Discrimination with the Nevada Equal Rights Commission. Plaintiffs participated in good faith and attempted to facilitate a negotiated resolution of their complaints by, for instance, providing defendant with sworn statements of witnesses and an electronic recording of sexually abusive and misogynistic music which was played openly and loudly at the large warehouse defendant maintains and operates, and where at plaintiff were employed, and which is located in northern Nevada. Attempts at

Page 1

achieving a negotiated resolution were not successful.   Plaintiffs exhausted the administrative procedure in good faith.  Plaintiffs requested and received "Notice[s] of Right to Sue" from the Equal Employment Opportunity Commission.  Copies of the sworn statements plaintiffs obtained, and provided to the Nevada Equal Rights Commission, and copies of the Notices of Right to Sue plaintiffs obtained accompanying this Complaint and Jury Demand and are incorporated herein.  Plaintiffs hereby request a jury trial relative to all issues so triable. Plaintiffs intend to move for class certification and wish to place defendant on notice at an early stage – hence the manner in which this case is entitled.

2. Defendant employed approximately two hundred and fifty to three hundred persons at the subject facility, which is quite large, i.e., totaling in excess of approximately 700,000 square feet.  The gender mix, i.e., the ratio of women to men was roughly equivalent. Defendant allowed sexually abusive and misogynistic "music" to be routinely played from various locations throughout this large facility, i.e., from approximately five different electronic speakers.  The electronic speakers tended to be powerful and of good quality. Accordingly, the lyrics of the various songs could be clearly heard from a considerable distance, e.g., from several hundred feet.  That is, because of the background noise of the warehouse, the music was played very loudly, so as to enable it being heard over the background noise.  Defendant allowed various employees and managers to stream the music into the speakers for a protracted period, i.e., from shortly after defendant began operating the facility until the late winter or early spring of 2020 – at which time defendant became aware some of the named plaintiffs had retained counsel and intended to initiate this lawsuit.  Plaintiffs became familiar with the sentiments of a large number of their co-employees regarding the rap music.  Many of those co-employees, especially women, expressed their feelings and perceptions – to the effect the music was offensive and degrading to women. The rate of employee turnover at this recently opened warehouse, during the time plaintiffs were employed, was high.  Accordingly, there is a pool of potential women plaintiffs which probably totals in excess of at least 200 persons, i.e., a pool

of female potential plaintiffs who probably were offended by the misogynistic and sexually abusive music, and related conduct. Further, a number of men who were employed were offended by the music and related conduct "because of sex". And, as with plaintiff Anthony Baker, a number of men were offended both by the music and related conduct – and by their inability to protect their female co-workers therefrom. That is, they were offended "because of sex" as defined by Title VII of the 1964 Civil Rights Act.

3. Persons who have not timely filed administrative complaints with either the Nevada Equal Rights Commission or the Equal Employment Opportunity Commission should be permitted to intervene (or "piggyback") as class members per the "single-filing" rule, once class certification is granted. *See, e.g., Arizona v. The Geo Group*, 816 F.3d 1189 (9th Cir. 2016).

4. Defendant S & S Activewear is a corporation, limited liability company, partnership or some other legal entity which maintains and operates a large warehouse, at which plaintiffs were employed, in Washoe County, State of Nevada and on the premises of which all, or almost all, acts, statements and omissions herein alleged occurred. At all times herein mentioned defendant employed at least fifteen (15) persons for at least twenty weeks per year. In fact, during all relevant times, defendant employed in excess of 500 persons throughout the entire year, as well as several preceding years.

5. This Court has subject matter jurisdiction over this case per 28 U.S.C. 1343. The Court has subject matter jurisdiction because five plaintiffs are women, and one is a man, who were offended and humiliated as the result of a sexually hostile work environment created and/or maintained by defendant. Likewise any other class members will assert similar or identical claims. A hypothetical reasonable person, man or woman, could easily have been offended by the sexual and misogynistic hostility which defendant permitted to exist and permeate its work environment. Injunctive and/or declaratory relief are sought pursuant to 28 U.S.C. sections 2201 and 2202.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6. This Court has venue re this action pursuant to 42 U.S.C. 2000e-5(f)(3) because all, or almost all of the actions, statements and omissions which form the basis for this lawsuit occurred in northern Nevada, i.e., in the geographical area of this judicial District.

First Cause of Action

(Sexual Harassment)

7. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 6, inclusive, as well as all other paragraphs herein, as though the same were fully stated.

8. Plaintiffs were employed by defendant in non-managerial positions. Any supervisory tasks and/or authority which any plaintiffs may have had or exercised were fairly insignificant. That is, none of the plaintiffs were designated as a "Manager", or functioned as such. Throughout much, or in most instances, all, of their tenures plaintiffs were subject to sexual and/or gender harassment "because of sex", a prohibited by 42 U.S.C. sec. 2000e, et seq. Plaintiffs' work environment was rendered hostile and offensive primarily by repeated and prolonged exposure to sexually foul and abusive music, i.e., "hiphop" or "rap" music. Defendant permitted a number of its employees and managers to routinely and loudly play this music in its work environment. The subject work environment is large, i.e., totaling approximately in excess of 700,000 square feet. With the normal daily background music sound from a particular speaker could not be heard throughout the entirety of this large work environment. On any given day a number of speakers were used by defendant's employees and/or managers to stream music from various locations into the work environment. That is, defendant's employees and manager would use "Blue Tooth" to stream music from commercial sources into electronic speakers. The music of which plaintiffs complained did not customarily, or ever, emanate from radio stations regulated by the Federal Communications Commission (FCC). The offensive music could be heard through much of the workplace, albeit not the entire workplace. On occasion, various employees placed speakers on a forklift, or other powered vehicle, and drove about the subject facility, while loudly broadcasting the

Page 4

offensive music via a speaker which had been placed on the vehicle.  Male employees openly shared pornographic videos, using their cellular telephones.  Male employees, including some supervisors, openly made sexual hand gestures, or gestures with their bodies, e.g., pantomiming sexual intercourse.  Male employees were treated in a preferential manner relative to female employees.  Sexual remarks such as "I would hit that", were openly made by various male employees.  Male employees were allowed to yell obscenities and to subject female employees, especially those who complained of sexual harassment, to various forms of retaliatory hostility. In appropriate remarks and inquiries were made by various male employees regarding the sexual orientation of at least one of the plaintiffs.

9. Defendant disseminated a written policy and made various formulaic statements which purported to prohibit its employees from sexual harassment and/or sexual hostility, such as sexually foul music, but routinely allowed conduct to occur which directly flouted its written and verbal promises to employees, to the effect they would be protected from sexual hostility. The content of the "music" which defendant routinely allowed to be loudly played at various locations throughout its hostility was incredibly foul and offensive.  For instance, women were routinely referred to as "hos" (slang for "whore"), bitches and "c__ts".  Songs such as "Stand", by Eminem, were loudly played.  That particular song touts the act of forcibly placing a pregnant woman in the trunk of a vehicle and then driving the vehicle into a river or other body of water, for the purpose of drowning her. The songs contained extraordinarily graphic and sexually foul content.  For example, one of the songs routinely played was "Blowjob Betty", a song by "Too Short".  That song references and glorifies prostitution, and concerns a prostitute who dies because of swallowing semen into her windpipe.  In addition to allowing these foul sexual, violent and misogynistic works to be routinely and loudly played throughout its facility, defendant allowed various male employees, and even managers, to sing along and to accompany their singing with various sexual gestures, e.g., grabbing their clothed genitals, while looking directly at various women employees.  In short, in addition to repeatedly and

Page 5

forcefully repudiating the written policy which defendant purportedly maintained in place, and which it promised it would enforce, the act, or omission, of allowing violently misogynistic and graphically sexually abusive material to be loudly and regularly broadcast throughout its facility actively successfully encouraged other acts and statements of a sexually abusive and/or misogynistic character.  By allowing obscene rap music to be routinely and frequently broadcast, defendant S & S Activewear guaranteed its work environment would be offensive "because of sex", especially re the average hypothetical woman, and relative to most of its women employees.  And, a number of men were offended by the manner in which the music portrayed men, and their relationships with women – as well by the fact they could not protect women from being openly abused on a daily basis.  Plaintiffs themselves were offended by the music and by various sexually-based statements and actions of their co-employees, often performed in sync with or in conjunction with the music.

10.  Defendant received notice on a daily, or almost daily basis, of the fact misogynistic and/or sexually offensive music was being openly played in its work environment.  Defendant received such notice by virtue of the music itself.  That is, on a daily basis, defendant had a number of managers present in the subject workplace and those managers, including high-level managers, could hear the lyrics of the music, which most often used the English language as a venue for communication.  That is, defendant's managers knew, and had to have known, songs with obscene and otherwise very sexually offensive and misogynistic lyrics were being loudly and frequently broadcast in defendant's work environment.  Furthermore, defendant received a number of complaints, including from some of the named plaintiffs, as well as from various other employees, mostly women, to the effect the music was offensive "because of sex", i.e., because of the obscene and sexually offensive and misogynistic character of the music. Defendant sometimes responded to such complaints by noting the music motivated employees. Defendant failed to take meaningful and consistent action to halt the music, and otherwise fulfill its promise of a work environment free of sexual hostility, until it learned some of the

plaintiffs had retained an attorney and intended to proceed against defendant legally, based on the fact obscene, sexually offensive and misogynistic music had been played in its work environment loudly and on a frequent basis, for almost two years.  Part and parcel of the hostility plaintiffs and potential collective action members experienced was defendant's repeated and protracted refusals to investigate and remedy the playing of rap music in its work environment.  For instance, notwithstanding its managers having fielded many complaints by employees as to the misogynistic and sexually offensive character of the music, defendant trivialized those complaints, and the foreseeable effects of playing such music.  Defendant failed to timely investigate, even though a number of employees complained and/quit and informed defendant they were quitting because of the prevalence of the foul rap music and various other forms of sexual harassment.

11.  As a direct and proximate result of being subject to a sexually hostile work environment, plaintiffs suffered emotional distress, loss of enjoyment of life, fear, anger, humiliation, loss of sleep and anxiety.  It has been necessary for plaintiffs to incur costs and retain counsel to attempt to vindicate their right to a workplace free from sexual hostility, gender-based hostility and retaliatory hostility.

Second Cause of Action

Collective Action Allegations

12.  Plaintiffs and prospective Collection Action Members re-allege and incorporate the allegations stated in paragraphs 1 through 11, inclusive, as well as the allegations in all other paragraphs herein.

13.  Plaintiffs bring this collective action for injunctive, declaratory and monetary relief pursuant to 29 U.S.C. sec. 216(b) on behalf of the following Collective Action:

> All persons who worked at the subject facility, i.e., the large warehouse in which plaintiffs worked, who were offended by "rap" or "hiphop" music, i.e., music which referenced women with pejorative terms and/or described acts of violence and sex with or directed at women, to a degree the terms and conditions of their work environment were adversely and materially altered, i.e., they experienced a sexually hostile work environment.   This class also includes men, who were offended by the

Page 7

manner in which men were portrayed, as well as being offended by the manner in which women were portrayed, and by their inability to protect their female co-workers from daily sexual harassment. This class includes all persons, described above, who worked at the subject facility during any period from approximately six weeks after it opened, until the end of March, 2020. That is, a period of slightly less than 2 years.

14.  S & S Activewear has engaged in systemic sexual harassment against the Class/Collective members. S & S Activewear, despite being on notice of the character of the offensive music via the circumstance the music was loudly, clearly and frequently played in its work environment, in the presence of many managerial level employees *and* the fact a number of employees complained of the misogynistic and sexually abusive character of the music, allowed such to be played for almost two years – until it became aware of an impending lawsuit.

15.  S & S Activewear disregarded the sexual harassment prevention policy which it promised its employees would protect them from sexual hostility.   S & S Activewear flouted federal law, i.e., 42 U.S.C. 2000e, et seq., aka Title VII, by routinely subjecting every person in its work environment who was offended by sexually offensive and misogynistic music to such music.

16.  Plaintiffs seek to be appointed as representatives of the Collective Action.

17.  There are many similarly situated Collective Action Members, i.e.,  certainly in excess of one hundred, and perhaps in excess of three hundred, who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Notice should be sent to the Collection Action Members pursuant to 29 U.S.C. sec. 216(b).

18.  Questions of law and fact common to plaintiffs and Collective Action Members include, but are not limited to, the following:

a.  How often was sexually abusive/misogynistic rap music played and over what period of time?

b.  Which employees worked in areas where at they could hear the music?

c.  If an employee did not work in an area where at the music could regularly be heard, how often did the employee have to travel through areas in which the music could be heard?

d. Which songs were most frequently played?

e. Which managerial employees actually arranged to have sexually abusive/misogynistic rap music played, e.g., by streaming such from their I-phones to speakers located in defendant's workplace?

f. Which of defendant's Managers were aware the music was being played?

g. Which employees complained of the sexually abusive/misogynistic rap music; which Managers fielded the complaints; and how did defendant respond to the complaints?

h. How did defendant respond to the playing of the music in its facility?

i. Whether defendant had a policy which purported to prohibit the playing of sexually offensive/misogynistic rap music?

j. Did defendant enforce its policy via, for instance, conducting an investigation into who was responsible for playing such music, and then implementing discipline relative to those persons?

k. Should defendant be accorded immunity based upon the existence of a written sexual harassment policy and the manner in which it enforced, or did not enforce, that policy?

19. Plaintiffs bring this action as a class action re the persons described above in paragraph #13 for injunctive, declaratory and monetary relief pursuant to Federal Rule of Civil Procedure (FRCP) 23(a), (b)(2), (b)(3) and c)(4) of the FRCP for violations of Title VII of the 1964 Civil Rights Act.

20. Plaintiffs are members of the Class they seek to represent.

21. This action is properly maintained as a class action. The Class satisfies all the requirements of FRCP 23 for maintaining a class action.

22. **Ascertainability.** The potential members of the Class are known to S & S Activewear, i.e., defendant's business records memorialize the names, job titles, dates of employment, various data by which potential members may be located and identified, and last known addresses and telephone numbers.

23. **Numerosity.** The Class is so numerous that joinder of all members is

Page 9

impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. There are at least 150 members of the Class, and probably more.

24. **Existence and predominance of common questions of law or fact.** There are questions of law or fact that are common to the Class. These common questions predominate over questions affecting individual Class Members. See above, i.e., paragraph #18. The primary questions which affect only individual class members involve questions whether a particular Class Member was subject to retaliation for having opposed the playing of sexually abusive/misogynistic music. However, even with regard to questions/issues of retaliation, common questions of law and fact will predominate, e.g., what policy did defendant maintain and enforce regarding complaints of sexual harassment and/or a sexually hostile work environment?; did defendant routinely conduct thorough investigations regarding complaints of sexual harassment and/or a sexually hostile work environment?; did defendant perceive complaints regarding the rap music as constituting complaints of a sexually hostile work environment and/or sexual harassment?; and, did defendant factor the adverse effects of sexually abusive/misogynistic rap music when making employment decisions, e.g., decisions whether to discipline and/or terminate a particular employee?

25. **Typicality.** Plaintiffs' primary claims, i.e., of a sexually hostile work environment, are typical of those of the Class Members because they were subject to the same employment practice, i.e., allowing sexually abusive/misogynistic rap music to be disseminated through the workplace via approximately five high-powered speakers. Defendant does not possess any defenses which are unique to the plaintiffs re their primary cause of action.

26. **Adequacy of representation.** Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse or antagonistic to the interests of the other members of the Class. Plaintiffs have retained competent counsel who are experienced in sexual harassment cases. Counsel will associate with another attorney or attorneys who are experienced in litigating class action cases.

27. **Superiority.** A class action is superior to other methods for the fair and efficient

adjudication of the claims asserted herein.  A class action will permit the large number of similarly situated persons to prosecute their common claims in a single lawsuit and in a single forum simultaneously and efficiently, without duplication of time, effort and expense which would attend the prosecution of multiple individual actions.  Further, the prosecution of a class action will be consistent with the legislative goals underlying Title VII and will allow all potential plaintiffs who were offended by the rap music an opportunity to seek legal redress.

Class action is appropriate because S & S Activewear violated the rights of its employees on a wholesale basis, i.e., it allowed its work environment to be polluted with obscene and violently misogynistic rap music openly, for almost two years.  S & S Activewear, when confronted with its misconduct, denied it allowed such music to be played.  S & S Activewear has no legitimate rejoinder for the witnesses who have come forward, or for instance, for the electronic recording of the music being openly played, while employees work in a normal manner.  Class certification is appropriate because common questions of law and fact predominate over any questions affecting individual member and because a class action is a superior method for resolving the disputes presented by this case.

Third Cause of Action

(Retaliation/Plaintiff Sharp)

28.  The plaintiffs hereby incorporate the allegations of paragraphs 1 through 27, inclusive, as well as all other allegations herein, as though the same were alleged herein.  Plaintiff Sharp is bringing this Third Cause of Action.

29.  Plaintiff Stephanie Sharp commenced working for defendant on or about December 11, 2018.  She was constructively/wrongfully discharged on or about August 1, 2019.  Plaintiff Sharp complained to defendant's Human Resources Manager, Mr. David Zink, of the sexually graphic, abusive and misogynistic music.  Human Resources Manager Zink responded by telling plaintiff she should attempt to ignore the music.  Plaintiff Sharp subsequently complained about sexual by Supervisor Dean Anderson.  After she did so, Supervisor Anderson morphed intrinsically sexual harassment into excess scrutiny, i.e., retaliatory harassment, which is a form of sexual harassment.  In May, 2019, plaintiff once

Page 11

1    again complained of the sexual hostility in her work environment, including the abusive music.

2    She was once again instructed by defendant to attempt to ignore the music.

3        30. A reasonable woman, similarly situated to plaintiff Sharp would have found the

4    work environment to be intolerable. Plaintiff did so experience the work environment and was

5    wrongfully and constructively discharged on or about August 1, 2019. A constructive

6    discharge is a recognized form of retaliation per Title VII.

7        31. Plaintiff subsequently applied for unemployment benefits and her application was

8    denied. Plaintiff appealed. At the telephonic unemployment appeal hearing defendant

9    appeared, i.e., Human Resources Manager Zink appeared and lied to the Hearing Officer. That

10   is, Mr. Zink told the Hearing Office sexually graphic and misogynistic music had not been

11   played in plaintiff's workplace. Based in material part on Human Resources Manager Zink's

12   lies, the denial of unemployment benefits was affirmed. Defendant's lies, which caused

13   plaintiff to be denied benefits, constitute retaliation.

14       32. As a direct and proximate result of being subject to retaliation plaintiff was injured

15   as described herein. Further, plaintiff Sharp sustained economic damages.

16                                Fourth Cause of Action

17                            (Retaliation/Plaintiff Speight)

18       33. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 32, inclusive,

19   as well as the allegations of all other paragraphs stated herein. Plaintiff Speight is bringing this

20   cause of action.

21       34. Plaintiff Speight commenced working for defendant on or about November 15,

22   2018, and was constructively and wrongfully discharged on or about May 30, 2019.

23   Throughout almost the entirety of her employment Ms. Speight was subject to sexually graphic

24   and misogynistic music on a regular basis. She complained on a number of occasions to

25   defendant's Human Resources Manager, David Zink, of the music, but defendant failed to

26   implement any timely remedial action, or to conduct a reasonable investigation. Plaintiff

27   Speight witnessed a number of instances of sexually inappropriate conduct and statements,

28   which occurred on the premises, as alleged herein.

35. A reasonable woman, similarly situated to plaintiff Speight, would have found the work environment to be intolerable, as plaintiff Speight did so experience the work environment.

36. As a direct and proximate result of being subject to a constructive/wrongful discharge, plaintiff Speight was injured and damaged as described herein and further, suffered economic damages.

WHEREFORE, plaintiff requests the following relief:

1. For awards of compensatory damages;

2. For awards of punitive damages sufficient to punish and deter defendant from engaging in similar conduct;

3 For awards of special or actual economic damages relative to those plaintiffs who have sustained such damages and pray for such, according to proof;

4. For an award of costs and a reasonable attorney's fee; and

5. For injunctive relief to compel defendant to adopt and actually enforce a reasonable policy against sexual harassment and/or retaliation, and for whatever other relief the Court or jury may deem just.

DATED this 23rd day of November, 2020.

Mark Mausert
NV Bar No. 2398
729 Evans Avenue
Reno, NV 89512
TELEPHONE:(775) 786-5477
FACSIMILE: (775) 786-9658
*Attorney for Plaintiffs*

**INDEX OF EXHIBITS**

Stephanie Sharp Notice of Right to Sue..............................................................Exhibit 1

Laura Viramontes Garcia Notice of Right to Sue...........................................Exhibit 2

Anthony Baker Notice of Right to Sue...........................................................Exhibit 3

Patricia Speight Notice of Right to Sue..........................................................Exhibit 4

Rebecca Garoutte Notice of Right to Sue.......................................................Exhibit 5

Cynthia Martinez Notice of Right to Sue.......................................................Exhibit 6

Rex Bernat Declaration...................................................................................Exhibit 7

Josh Peaslee Declaration.................................................................................Exhibit 8

Miguel Angel Ramirez Puentes Declaration...................................................Exhibit 9

Anthony Baker Declaration............................................................................Exhibit 10

Matthew Wilson Declaration..........................................................................Exhibit 11

Jerome Santiago Declaration..........................................................................Exhibit 12

PLEADING TITLE - 1