Mark Mausert
NV Bar No. 2398
729 Evans Avenue
Reno, NV 89512
(775) 786-5477
Fax  (775) 786-9658
mark@markmausertlaw.com

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| STEPHANIE SHARP, CYNTHIA MARTINEZ, PATRICIA SPEIGHT, LAURA VIRAMONTES GARCIA, REBECCA GAROUTTE, ANTHONY BAKER, SHARENE WAGONER, & RUBY LOPEZ COLOCHO, | Case No.: 3:20-cv-00654-MMD-CLB |

            Plaintiffs,

        vs.

S & S ACTIVEWEAR, L.L.C.

           Defendant.

_____/

**FIRST AMENDED COMPLAINT AND JURY DEMAND AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

COME NOW plaintiffs, through counsel, and hereby complain of defendant as follows:

<u>Jurisdiction, Venue & Jury Demand</u>

1.  Seven of the named plaintiffs are adult women and one is an adult man who, while employed by defendant in northern Nevada, resided in northern Nevada.  All, or almost all, acts, statements and omissions herein alleged occurred in northern Nevada.  All plaintiffs timely filed administrative complaints, and then Charges of Discrimination with the Nevada Equal Rights Commission.   Plaintiffs requested and received "Notice[s] of Right to Sue" from the Equal Employment Opportunity Commission.  Copies of the Notices of Right to Sue plaintiffs obtained accompanying this Complaint and Jury Demand and are incorporated herein. Plaintiffs hereby request a jury trial relative to all issues so triable.  Plaintiffs intend to move

for class certification and wish to place defendant on notice at an early stage – hence the manner in which this case is entitled.

2. Defendant employed approximately two hundred and fifty to three hundred persons at the subject facility, which is quite large, i.e., totaling in excess of approximately 700,000 square feet. The gender mix, i.e., the ratio of women to men was roughly equivalent. Defendant allowed sexually abusive and misogynistic "music" to be routinely played from various locations throughout this large facility, i.e., from approximately five different electronic speakers. The electronic speakers tended to be powerful and of good quality. Accordingly, the lyrics of the various songs could be clearly heard from a considerable distance, e.g., from several hundred feet. That is, because of the background noise of the warehouse, the music was played very loudly, so as to enable it being heard over the background noise. Defendant allowed various employees and managers to stream the music into the speakers for a protracted period, i.e., from shortly after defendant began operating the facility until the late winter or early spring of 2020 – at which time defendant became aware some of the named plaintiffs had retained counsel and intended to initiate this lawsuit. Plaintiffs became familiar with the sentiments of a large number of their co-employees regarding the rap music. Many of those co-employees, especially women, expressed their feelings and perceptions – to the effect the music was offensive and degrading to women. The rate of employee turnover at this recently opened warehouse, during the time plaintiffs were employed, was high. Accordingly, there is a pool of potential women plaintiffs which probably totals in excess of at least 200 persons, i.e., a pool of female potential plaintiffs who probably were offended by the misogynistic and sexually abusive music, and related conduct. Further, a number of men who were employed were offended by the music and related conduct "because of sex". And, as with plaintiff Anthony Baker, a number of men were offended both by the music and related conduct – and by their inability to protect their female co-workers therefrom. That is, they were offended "because of sex" as defined by Title VII of the 1964 Civil Rights Act.

3.  Persons who have not timely filed administrative complaints with either the Nevada Equal Rights Commission or the Equal Employment Opportunity Commission should be permitted to intervene (or "piggyback") as class members per the "single-filing" rule, once class certification is granted.  *See, e.g., Arizona v. The Geo Group*, 816 F.3d 1189 (9th Cir. 2016).

4.  Defendant S & S Activewear is a corporation, limited liability company, partnership or some other legal entity which maintains and operates a large warehouse, at which plaintiffs were employed, in Washoe County, State of Nevada and on the premises of which all, or almost all, acts, statements and omissions herein alleged occurred.  At all times herein mentioned defendant employed at least fifteen (15) persons for at least twenty weeks per year. In fact, during all relevant times, defendant employed in excess of 500 persons throughout the entire year, as well as several preceding years.

5.  This Court has subject matter jurisdiction over this case per 28 U.S.C. 1343.   The Court has subject matter jurisdiction because seven plaintiffs are women, and one is a man, who were offended and humiliated as the result of a sexually hostile work environment created and/or maintained by defendant.  Likewise any other class members will assert similar or identical claims. A hypothetical reasonable person, man or woman, could easily have been offended by the sexual and misogynistic hostility which defendant permitted to exist and permeate its work environment.  Injunctive and/or declaratory relief are sought pursuant to 28 U.S.C. sections 2201 and 2202.

6.  This Court has venue re this action pursuant to 42 U.S.C. 2000e-5(f)(3) because all, or almost all of the actions, statements and omissions which form the basis for this lawsuit occurred in northern Nevada, i.e., in the geographical area of this judicial District.

<u>Collective Action Allegations</u>

7.  Plaintiffs and prospective Collective Action Members re-allege and incorporate the allegations of all paragraphs stated herein.

8.  Plaintiffs bring this collective action for injunctive, declaratory and monetary relief pursuant to 29 U.S.C. sec. 216(b) on behalf of the following Collective Action: During any period from approximately six weeks after defendant commenced commercial operations at the subject location until the end of March, 2020, S & S Activewear engaged in systemic sexual harassment against the Class/Collective members.  S & S Activewear, despite being on notice of the character of offensive music, authored by such musicians as Too Short (see, e.g., "Blowjob Betty"), and Eminem (see, e.g., "Stand"), Lil Wayne, and other "rappers", was sexually graphic, violently misogynistic and offensive to women because of the repetitive use of gender-offensive terms such as "bitch" and "c__t", allowed the music to be loudly, clearly and frequently played in its work environment, in the presence of many managerial employees. S & S Activewear allowed the music to be played despite the fact a number of employees complained thereof, i.e., employees specifically complained of the sexually abusive, graphic and violently misogynistic character of the music.  S & S Activewear continued to allow the music to be played until such time it became of the fact a number of employees retained counsel and intended to bring a Title VII action, based primarily on the fact the work environment was permeated with offensive "rap" music.

9.  S & S Activewear disregarded the sexual harassment prevention policy which it promised its employees would protect them from sexual hostility.  S & S Activewear flouted federal law, i.e., 42 U.S.C. 2000e, et seq., aka Title VII, by routinely subjecting every person in its work environment to sexually offensive and violently misogynistic music.

10.  Certain named plaintiffs seek to be appointed as representatives of the Collective Action.  That is, Stephanie Sharp, who worked in the subject warehouse from December 11, 2018 until August 1, 2019, and performed non-managerial warehouse labor; Patricia Speight, who worked in the subject warehouse from November 15, 2018 until May 30, 2019, and performed non-managerial warehouse labor; and Rebecca Giaroutte, who worked in the subject warehouse from January 21, 2019, until August 12, 2020, and performed non-managerial

warehouse labor, will be identified as class representative.  The class representatives have interests which are closely aligned, if not identical, with the class members, and experienced the same offensive music, and the same, or similar instances of sexual abuse which the other class members did.

11.  There are many similarly situated Collective Action Members, i.e., certainly in excess of one hundred, and perhaps in excess of three hundred, who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Notice should be sent to the Collective Action Members pursuant to 29 U.S.C. sec. 216(b).

12.  Questions of law and fact common to plaintiffs and Collective Action Members include, but are not limited to, the following:

a.  Whether and how frequently did defendant cause or allow sexually abusive/misogynistic rap music to be loudly played in its work environment?

b.  Whether some of defendant's managerial employees arranged for sexually abusive/misogynistic rap music to be played in the subject warehouse work environment, e.g., by streaming such music from I-phones or other electronic devices to speakers located in the defendant's workplace?

c.  Which of defendant's Managers were aware sexually offensive/misogynistic rap music was being played?

d.  Whether defendant allowed and/or encouraged the playing of said music even after receiving complaints from plaintiffs and/or other employees about the sexually offensive and/or misogynistic character of the music?

e.  Whether defendant should be accorded immunity based upon the existence of a written sexual harassment policy and the manner in which was enforced/or not enforced?

13.  Plaintiffs bring this action as a class action re the persons described above for injunctive, declaratory and monetary relief pursuant to Federal Rule of Civil Procedure 23(a),

(b)(2), (b)(3) and (c)(4) for violations of Title VII of the 1964 Civil Rights Act, aka 42 U.S.C. 2000e, et seq.

14.  Plaintiffs are members of the Class they seek to represent.

15.  This action is properly maintained as a class action.  The Class satisfies all the requirement of FRCP 23 for maintaining a class action.

16.  **Ascertainability**.  The potential members of the Class are known to S & S Activewear, i.e., defendant's business records memorialize the names, job titles, dates of employment, various data by which potential members may be located and identified, including last known addresses (physical and email), and telephone numbers.

17.  **Numerosity.**  The Class is so numerous that joinder of all members is impractical and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   There are at least 200 potential members of this Class.

18.  **Existence and predominance of common questions of law or fact.**  There are questions of law or fact that are common to the Class.  These common questions predominate over questions affecting individual Class Members, i.e., the questions which affect individual members involve the subjective determination of damages.   However, even those questions tend to implicate common questions, to wit, to what degree does the repetitive playing of sexually obscene and misogynistic music affect a reasonable woman.  The variations re the answer re individual plaintiffs are overshadowed by the common questions of fact and law.  The primary questions which affect only individual class members involves questions whether a particular Class Member was subject to retaliation for having opposed the playing of sexually abusive/misogynistic music.  However, even with regard to questions/issues of retaliation, common questions of law or fact will predominate, e.g., what policy did defendant maintain and enforce regarding complaints of sexual harassment and/or prevention of sexual harassment?; did defendant routinely conduct thorough investigations regarding complaints of sexual harassment and/or hostility?; did defendant perceive complaints regarding rap music as

constituting complaints of sexual harassment/sexual hostility?; and did defendant factor the adverse effets of sexually abusive/misogynistic rap music when making employment decisions, e.g., decisions whether to discipline and/or terminate a particular employee?

19. **Typicality.** Plaintiffs' primary claims, i.e., of a sexually hostile work environment, are typical of those of the Class Members because they were subject to the same employment practice, i.e., allowing sexually abusive/misogynistic rap music to be disseminated through the workplace via approximately five high-powered speakers. Defendant does not possess any defenses which are unique to the plaintiffs re their primary cause of action.

20. **Adequacy of representation.** Plaintiffs will fairly and adequately protect the interests of the Class and the Class Representative and counsel have no interests adverse or antagonistic to the interests of the other members of the Class. Plaintiffs have retained competent counsel who is experienced in sexual harassment/retaliation cases. Counsel will shortly associate with an attorney experienced in prosecuting class action cases.

21. **Superiority.** A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein. A class action will permit the large number of similarly situated persons to prosecute their common claims in a single lawsuit and in a single forum simultaneously and efficiently, without duplication of time, effort and expense which would attend the prosecution of multiple individual actions. Further, the prosecution of a class action will be consistent with the legislative goals underlying Title VII and will allow all potential plaintiffs who were offended by the rap music an opportunity to seek legal redress.

Class action is appropriate because S & S Activewear violated the rights of its employees on a wholesale basis, i.e., it allowed its work environment to be polluted with sexually abusive and violently misogynistic rap music openly, for almost two years. S & S Activewear, when confronted with its misconduct, denied it allowed such music to be played. S & S Activewear has no legitimate rejoinder to the witnesses who have come forward, or for instance, to the electronic recording of such music being openly played, while employees

within earshot worked in a normal manner (that is, they were obviously accustomed to the

playing of rap music).  Class certification is appropriate because common questions of law and

fact strongly predominate over any questions affecting individual member and because a class

action is a superior method for resolving the disputes presented by this case.  Another factor

which militates for class certification involves consideration of the economic disparity between

the parties, i.e., the plaintiffs are working people who earn wages consistent with unskilled

labor (approximately $17.00 per hour).  The individual plaintiffs, almost on a uniform basis, do

not possess the requisite resources to retain competent counsel on an hourly basis.  The only

practical way for such similarly situated employees to obtain legal representation is via

application of FRCP 23.

First Cause of Action

(Sexual Harassment)

22.  Plaintiffs hereby incorporate the allegations of paragraphs 1 through 21, inclusive,

aswell as all other paragraphs herein, as though the same were fully stated.

23.  Plaintiffs were employed by defendant in non-managerial positions.  Any

supervisory tasks and/or authority which any plaintiffs may have had or exercised were fairly

insignificant. That is, none of the plaintiffs were designated as a "Manager", or functioned as

such.  Throughout much, or in most instances, all, of their tenures plaintiffs were subject to

sexual and/or gender harassment "because of sex", a prohibited by 42 U.S.C. sec. 2000e, et seq.

Plaintiffs' work environment was rendered hostile and offensive primarily by repeated and

prolonged exposure to sexually foul and abusive music, i.e., "hiphop" or "rap" music.

Defendant permitted a number of its employees and managers to routinely and loudly play this

music in its work environment.  The subject work environment is large, i.e., totaling in excess

of 700,000 square feet.  The music from any particular speaker could not be heard throughout

the entirety of this large work environment.   On any given day a number of speakers were used

by defendant's employees and/or managers to stream music from various locations into the

Page 8

work environment.  That is, defendant's employees and managers would use "Blue Tooth" to stream music from commercial sources into the approximate five electronic speakers.  The music of which plaintiffs complained did not customarily, or ever,  emanate from radio stations regulated by the Federal Communications Commission (FCC). The offensive music could be heard through much of the workplace, albeit not the entire workplace.  On occasion, various employees placed speakers on a forklift, or other powered vehicles, and drove about the subject facility, while loudly broadcasting the offensive music via a speaker which had been placed on the vehicle.  By allowing the playing of obscene and misogynistic rap music defendant effectively negated any effect attendant to the dissemination of its paper sexual harassment policy and instead implicitly ratified and/or invited a myriad form of sexually and gender-offensive conduct.   This implicit repudiation of a reasonable sexual harassment policy resulted in a myriad form of sexually offensive conduct and statements.  For instance, male employees openly shared pornographic videos, using their cellular telephones.  Male employees, including some supervisors, openly made sexual hand gestures, or movements with their bodies, e.g., pantomiming sexual intercourse.  Male employees were treated in a preferential manner relative to female employees.  Sexual remarks such as "I would hit that", were openly made by various male employees.  Male employees were allowed to yell obscenities and to subject female employees, especially those who complained of sexual harassment, to various forms of retaliatory hostility.  In appropriate remarks and inquiries were made by various male employees regarding the sexual orientation of at least one of the plaintiffs.

24. Defendant disseminated a written policy and made various formulaic statements which purported to prohibit its employees from sexual harassment and/or sexual hostility, such as sexually foul music, but nonetheless  routinely allowed conduct to occur which directly flouted its ostensible written and verbal promises to employees, to the effect they would be protected from sexual hostility.   That is, defendant manifested knowledge re the inappropriate character of the course of conduct alleged herein, and the effects such a course probably would

Page 9

have on many of its employees, but opted for the conduct because doing so was expedient and easy, i.e., it placated the many employees who wished to listen to such music – in derogation of the emotional health of many employees whom defendant knew, and should have known, would be offended and even traumatized, and re-traumatized.  The content of the "music" which defendant routinely allowed to be loudly played at various locations throughout its hostility was incredibly foul and offensive.  For instance, women were routinely referred to as "hos" (slang for "whore"), bitches and "c__ts".  Songs such as "Stand", by Eminem, were loudly played.  That particular song touts the act of forcibly placing a pregnant woman in the trunk of a vehicle and then driving the vehicle into a river or other body of water, for the purpose of drowning her. The songs contained extraordinarily graphic and sexually foul content.  For example, a number of the songs were  by "Too Short", who routinely writes sexually graphic and very offensive, and misogynistic lyrics.  One song, for instance, references and glorifies prostitution.  In addition to allowing these foul sexual, violent and misogynistic works to be routinely and loudly played throughout its facility, defendant allowed various male employees, and even managers, to sing along and to accompany their singing with various sexual gestures, e.g., grabbing their clothed genitals, while looking directly at various women employees.  In short, in addition to repeatedly and forcefully repudiating the written policy which defendant purportedly maintained, and which it promised it would enforce, the act, or omission, of allowing violently misogynistic and graphically sexually abusive material to be loudly and regularly broadcast throughout its facility actively successfully encouraged other acts and statements of a sexually abusive and/or misogynistic character.  By allowing obscene rap music to be routinely and frequently broadcast, defendant S & S Activewear guaranteed its work environment would be offensive "because of sex", especially re the average hypothetical woman, and relative to most of its women employees.  And, a number of men were offended by the manner in which the music portrayed men, and their relationships with women – as well by the fact they could not protect women from being openly abused on a daily basis. were

offended by the music and by various sexually-based statements and actions of their co-employees, often performed in sync with or in conjunction with the music.

25. Defendant received notice on a daily, or almost daily basis, of the fact misogynistic and/or sexually offensive music was being openly played in its work environment.  Defendant received such notice by virtue of the music itself. That is, on a daily basis, defendant had a number of managers present in the subject workplace and those managers, including high-level managers, could hear the lyrics of the music, which most often used the English language as a venue for communication.  That is, defendant's managers knew, and had to have known, songs with obscene and otherwise very sexually offensive and misogynistic lyrics were being loudly and frequently broadcast in defendant's work environment.  Furthermore, defendant received a number of complaints, including from some of the named plaintiffs, as well as from various other employees, mostly women, to the effect the music was offensive "because of sex", i.e., because of the obscene and sexually offensive and misogynistic character of the music.  Defendant sometimes responded to such complaints by noting the music motivated employees.  Defendant failed to take meaningful and consistent action to halt the music, and otherwise fulfill its promise of a work environment free of sexual hostility, until it learned some of the plaintiffs had retained an attorney and intended to proceed against defendant legally, based on the fact obscene, sexually offensive and misogynistic music had been played in its work environment loudly and on a frequent basis, for almost two years.  Part and parcel of the hostility plaintiffs and potential collective action members experienced was defendant's repeated and protracted refusals to investigate and remedy the playing of rap music in its work environment.  For instance, notwithstanding its managers having fielded many complaints by employees as to the misogynistic and sexually offensive character of the music, defendant trivialized those complaints, and the foreseeable effects of playing such music.  Defendant failed to timely investigate, even though a number of employees complained and/quit and informed defendant they were quitting because of the prevalence of the foul rap music and

various other forms of sexual harassment.

26.  As a direct and proximate result of being subject to a sexually hostile work environment, plaintiffs suffered emotional distress, loss of enjoyment of life, fear, anger, humiliation, loss of sleep and anxiety.  It has been necessary for plaintiffs to incur costs and retain counsel to attempt to vindicate their right to a workplace free from sexual hostility, gender-based hostility and retaliatory hostility.

Second Cause of Action

(Retaliation/Plaintiff Sharp)

27.  The plaintiffs hereby incorporate the allegations of paragraphs 1 through 26, inclusive, as well as all other allegations herein, as though the same were alleged herein. Plaintiff Sharp is bringing this Third Cause of Action.

28.  Plaintiff Stephanie Sharp commenced working for defendant on or about December 11, 2018.  She was constructively/wrongfully discharged on or about August 1, 2019.  Plaintiff Sharp complained to defendant's Human Resources Manager, Mr. David Zink, of the sexually graphic, abusive and misogynistic music.  Human Resources Manager Zink responded by telling plaintiff she should attempt to ignore the music.  Plaintiff Sharp subsequently complained about sexual by Supervisor Dean Anderson.  After she did so, Supervisor Anderson morphed intrinsically sexual harassment into excess scrutiny, i.e., retaliatory harassment, which is a form of sexual harassment.  In May, 2019, plaintiff once again complained of the sexual hostility in her work environment, including the abusive music. She was once again instructed by defendant to attempt to ignore the music.

29.  A reasonable woman, similarly situated to plaintiff Sharp would have found the work environment to be intolerable.  Plaintiff did so experience the work environment and was wrongfully and constructively discharged on or about August 1, 2019.  A constructive discharge is a recognized form of retaliation per Title VII.

30.  Plaintiff subsequently applied for unemployment benefits and her application was

denied.  Plaintiff appealed.  At the telephonic unemployment appeal hearing defendant

appeared, i.e., Human Resources Manager Zink appeared and lied to the Hearing Officer.  That

is, Mr. Zink told the Hearing Office sexually graphic and misogynistic music had not been

played in plaintiff's workplace.  Based in material part on Human Resources Manager Zink's

lies, the denial of unemployment benefits was affirmed.  Defendant's lies, which caused

plaintiff to be denied benefits, constitute retaliation.

31.  As a direct and proximate result of being subject to retaliation plaintiff was injured

as described herein. Further, plaintiff Sharp sustained economic damages.

Third  Cause of Action

(Retaliation/Plaintiff Speight)

32.  Plaintiffs hereby incorporate the allegations of paragraphs 1 through 31, inclusive,

as well as the allegations of all other paragraphs stated herein.  Plaintiff Speight is bringing this

cause of action.

33.  Plaintiff Speight commenced working for defendant on or about November 15,

2018, and was constructively and wrongfully discharged on or about May 30, 2019.

Throughout almost the entirety of her employment Ms. Speight was subject to sexually graphic

and misogynistic music on a regular basis.  She complained on a number of occasions to

defendant's Human Resources Manager, David Zink, of the music, but defendant failed to

implement any timely remedial action, or to conduct a reasonable investigation.  Plaintiff

Speight witnessed a number of instances of sexually inappropriate conduct and statements,

which occurred on the premises, as alleged herein.

34.  A reasonable woman, similarly situated to plaintiff Speight, would have found the

work environment to be intolerable, as plaintiff Speight did so experience the work

environment.

35.  As a direct and proximate result of being subject to a constructive/wrongful

discharge, plaintiff Speight was injured and damaged as described herein and further, suffered

1  economic damages.

2      WHEREFORE, plaintiffs request the following relief:

3      1.  For awards of compensatory damages;

4      2.  For awards of punitive damages sufficient to punish and deter defendant from

5  engaging in similar conduct;

6      3  For awards of special or actual economic damages relative to those plaintiffs who

7  have sustained such damages and pray for such, according to proof;

8      4.  For an award of costs and a reasonable attorney's fee; and

9      5.  For injunctive relief to compel defendant to adopt and actually enforce a reasonable

10  policy against sexual harassment and/or retaliation, and for whatever other relief the Court or

11  jury may deem just.

12      DATED this 19th day of February, 2021.

13

14      /s/ Mark Mausert
Mark Mausert
15  NV Bar No. 2398
729 Evans Avenue
16  Reno, NV 89512
TELEPHONE:(775) 786-5477
17  FACSIMILE: (775) 786-9658
*Attorney for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

Page 14